**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| DEV RAMACHANDRAN | § | |
| *plaintiff* | § | CA No. _____ |
| | § | |
| CHASWARE GROUP, LLC D/B/A | § | |
| PATIENT ACCOUNTING SERVICE | § | |
| CENTER, LLC D/B/A | § | JURY TRIAL DEMANDED |
| GETIXHEALTH, LLC; | § | |
| TRIVEST PARTNERS, LLC,; | § | |
| CHARLES BRACKEN, Individually, & | § | |
| KEVIN LONERGAN, Individually | § | |
| *defendants* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW PLAINTIFF DEV RAMACHANDRAN ("Plaintiff") and files this his

Original Petition complaining of Defendants Chasware Group, LLC d/b/a Patient Accounting

Service Center, LLC, d/b/a GetixHealth, LLC, Trivest Partners, LLC, and Charles Bracken, CEO

of GetixHealth, individually, ("Defendants" or "Getix et al"), and for cause therefore would shoe

the Court as follows:

### I. PARTIES

1. Plaintiff Mr. Dev Ramachandran is an individual residing in Travis County, Austin, Texas.

2. Defendant Chasware Group, LLC d/b/a Patient Accounting Service Center, LLC, d/b/a
   GetixHealth, LLC is a Limited Liability Company, whose principal place of business is in
   Houston, Texas.  This Defendant may be served with process by service upon its
   registered agent, CSC Lawyers Incorporating Service Company, 211 East 7th Street,
   Austin, Texas, 78701-3218.

3. Defendant Charles Bracken, CEO of Defendant GetixHealth, LLC may be served with
   process by service upon his registered agent, CSC Lawyers Incorporating Service

Company, 211 East 7th Street, Austin, Texas, 78701-3218.

4.  Defendant Kevin Lonergan, President of Defendant GetixHealth, LLC may be served with process by service upon his registered agent, CSC Lawyers Incorporating Service Company, 211 East 7th Street, Austin, Texas, 78701-3218.

5.  Defendant Trivest Partners is an entity with a majority / controlling share in GetixHealth, and is located in Coral Gables, Florida.

## II.  JURISDICTION & VENUE

6.  This Court has Jurisdiction over the claim because the Plaintiff has asserted a claim arising under Federal Law; specifically 42. U.S.C. §1981, 42 U.S.C. 2000e *et seq*., and 28 U.S.C. §1343.  Jurisdiction is also proper as a matter of diversity as the amount in controversy exceeds $75,000.00 USD. Defendants Charles Bracken and GetixHealth qualifies as an "employer" under §21.002(8)(a).

7.  Venue is proper under this District because the Defendants have significant business interests in this district, and it is the District of Residency of a Corporation in a state with multiple districts, pursuant to 28 U.S.C. §§1391 (b)(2) & (d).

## III.  TITLE VII EXHAUSTION OF ADMINISTRATIVE REMEDY

8.  Mr. Ramachandran's claims for racial discrimination and retaliation are partially based on Title VII of the Civil Rights Act of 1964, as catalogued in 42. U.S.C. 2000e et seq.. Exhaustion occurs (i) when the plaintiff files a timely charge with the EEOC, and (ii) receives a statutory notice of right to sue.  *See Dao v. Auchan Hypermarket*, 96 F.3d 787, 788-89 (5th Cir. 1996).

9.  Regarding the first requirement, Mr. Ramachandran filed his EEOC claims timely, Charge No. 31C-2019-00278 against GetixHealth, mailed August 26th, 2020.

10.     Regarding the second requirement, Mr. Ramachandran received a statutory notice of right to sue from the EEOC, and he is timely filing suit after having received that notice. Accordingly, Mr. Ramachandran has exhausted his administrative remedies under TITLE VII.

## IV.   1981 EXHAUSTION OF ADMINISTRATIVE REMEDY

11.     Mr. Ramachandran's claims for race discrimination are partially based on 42 U.S.C. §1981. Section 1981 claims have no exhaustion requirement. *See Williams v. E.I. du Pont de Nemours*, 154 F. Supp. 3d 407, 420 (M.D. La. 2015). Ms. McClain's Section 1981 race discrimination claims are subject to a four-year statute of limitations. *See, e.g., White v. BFI Waste Servs., LLC*, 375 F.3d 288, 292 (4th Cir. 2004) ("[C]laims of discrimination in compensation [under § 1981] arise under the 1991 amendments" and thus, are subject to the four-year statute of limitations.).

12.     Pursuant to the language of 42 U.S.C. § 1981 et seq, there is no administrative filing requirement with any agency under the purview of the United States government, hence no requirement to be met prior to bringing a claim, under this statute, in a court of competent jurisdiction.

13.     Pursuant to 28 U.S.C. § 1658(a), there is a four (4) year statute of limitations on any claim brought under 42 U.S.C. § 1981. As the incident(s) made the crux of this case occurred between approximately June 15th, 2017 and April 2nd, 2018, Plaintiff affirms that cause is brought within the statute of limitations.

14.     As GetixHealth and Trivest Partners are not government entities or contractors, and Mr. Charles Bracken is not an employee of the United States government, or any state or municipal agency therewith, an individual cause is not needed under 42 U.S.C. § 1983.

## V.   FACTUAL ALLEGATIONS

15.    Mr. Dev Ramachandran joined GetixHealth on or about May 23, 2016.  Mr. Charles

Bracken, CEO of GetixHealth, hired Dev himself, and placed him under the management

of Kevin Lonergan, President. As a Senior Vice President of Sales, Mr. Ramachandran

was responsible for bringing very large organic sales to GetixHealth. Mr. Charles Bracken

served as the CEO of GetixHealth.  Mr. Kevin Lonergan served as the President of

GetixHealth during all times relevant.

16.    During his tenure as Mr. Ramachandran's immediate supervisor, Mr. Lonergan never

spoke to Mr. Ramachandran – not in person, not via text message, not over the phone,

and no communications by email.  However, he did speak to Eric Ostrosky (Caucasian)

another direct report of Mr. Lonergan's. Mr. Ramachandran was systematically isolated,

denied training, guiding, and input, and was consistently left out of meetings which were

integral and essential to the completion of Mr. Ramachandran's duties and responsibilities.

17.    This passive discrimination and harassment, while not affirmatively attacking Mr.

Ramachandran, did accomplish the goal of making his job duties and responsibilities

untenable. Mr. Lonergan had consistent one-on-one meetings with his other direct reports,

all of whom were Caucasian, yet refused to meet with Mr. Ramachandran. And with zero

communication, Mr. Ramachandran had no direction and no leadership, and was

essentially ostracized.

18.    In 2017, Mr. Ramachandran was given oversight of private contractors Gary Rogers and

Tamra Swindoll; neither of whom were actual employees of GetixHealth.  The contractors

were brought in, on an *ad hoc* basis, in order to court and secure potential new clients for

GetixHealth. These contractors were Mr. Ramachandran's direct reports – not his

competition.  However, GetixHealth would approach both Ramachandran *and* these *ad hoc* contractors to perform the same duties, thus created a false competition between them, where only one individual would receive their earned commission.

19.     In May of 2017, Mr. Ramachandran complained of Mr. Lonergan's isolationist behavior, as well as his passive discrimination against him.  Mr. Bracken's response was to remove Mr. Ramachandran from Mr. Lonergan's purview, and have Mr. Ramachandran report directly to Jeffery Schulman – another Senior Vice President and Mr. Ramachandran's contemporary / counterpart.

20.     During June and July of 2017, Mr. Schulman was essentially harassing and berating Mr. Ramachandran as a cat's paw for Lonergan, continuing the same order of behavior perpetrated by his prior manager. On personal information and knowledge, Mr. Schulman's aggressive and discriminatory behavior towards Mr. Ramachandran is memorialized in threads of emails.

21.     This behavior included constant inquiries as to whether Mr. Ramachandran even wanted to work in the industry - asking him why he didn't just quit. These emails were then CC'd to Mr. Bracken and Mr. Lonergan, and contained a series of complaints lodged by Mr. Ramachandran to Emma Donald, and Mr. Bracken himself.

22.     In July of 2017, this discrimination and hostile work environment was crystalized in Mr. Schulman 'uninviting' Mr. Ramachandran from Getix bi-weekly meetings, known as "Executive Huddle" conference calls. Using the color of his authority, Mr. Schulman attempted, and succeeded, at prohibiting Mr. Ramachandran from access to these meetings – meetings which transmitted information and data vital to the execution and completion of Mr. Ramachandran's duties and responsibilities at GetixHealth.

23.     This series of events ultimately prompted Mr. Bracken to then remove Mr. Ramachandran from the purview of either Lonergan or Schulman, and allow Mr. Ramachandran to report directly to him. However, this did not end the hostile work environment that Mr. Ramachandran was subjected to.  In point of fact, the hostility and abuse only increased.

24.     Towards the end of July, 2017, Mr. Ramachandran scheduled a teleconference with Ms. Emma Donald, the GetixHealth Human Resources Director, and Mr. Jeffery Schulman, in order to address Mr. Ramachandran's concerns of discrimination and hostile treatment. This call was cancelled by Mr. Bracken himself within an hour of it's scheduled setting.

25.     Mr. Ramachandran's complaints were not unnoticed by Mr. Bracken. Mr. Ramachandran would regularly schedule teleconferences with Mr. Bracken and Ms. Emma Donald - the head of GetixHealth Human Resources.  Without fail, Mr. Bracken would cancel every last teleconference setup to allow Mr. Ramachandran the opportunity to express his complaints of continuing discrimination in front of Ms. Donald.

26.     Mr. Bracken continued this string of negative treatment into the end of 2017. Bracken threatened to fire Mr. Ramachandran on 12/4/17 (for allegedly not working on a financial model spreadsheet with Michelle Garrison, our CFO on a Sunday), just after Mr. Bracken had wired fifty thousand dollars to Gary Rogers as commission for concluding a deal - which both Rogers and Ramachandran and worked on –  for getting GetixHealth 18 Cornerstone facilities.

27.     When questioned by Mr. Ramachandran, Mr. Bracken informed him that Getix would not pay both him and Rogers, and that if Mr. Ramachandran had an issue, he could speak to Ms. Garrison, the CFO.

**WAGE CONCERNS**

28.    Mr. Ramachandran began work with an initial offer than detailed a base salary, as well as commission. And commissions were based on revenue from completed deals which Mr. Ramachandran himself brought to GetixHealth and successfully closed. While most individuals may be on a (i) sales commission plan or an (ii) executive bonus plan – both dependant upon the overall success of the company.  Mr. Ramachandran was on *both*, but received neither commission nor bonus for his last calendar year of employment.

29.    On personal knowledge GetixHealth never had a Sales Commission plan. This was admitted to by Ramona Hernandez, a Senior Vice President similarly situated to Mr. Ramachandran, who had been with the company well before Mr. Ramachandran began employment.  On information and belief, Ms. Hernandez had to bring suit against GetixHealth herself, in order to recover her lost and unpaid wages, commissions, and/or bonus.

30.    It is an industry norm that most senior executives are eligible for Executive Bonuses. This is in contrast to Sales Commissions, which are relegated strictly to employees serving in a sales capacity.  Mr. Ramachandran was such a valuable asset to the company, that he was allowed to obtain both Bonus and Commission, upon the successful achievement of his duties and responsibilities, as well as the successful conclusion of the contracts which he brought to GetixHealth.

**UNPAID SALES COMMISSIONS**

31.    While there was a vague outline of the Sales Commissions owed to Mr. Ramachandran in his original contract for employment in broad strokes, there was in fact no viable Sales Commission plan which any employee could refer back to.  It was even described and

promised in his contract for employment, that Mr. Ramachandran would receive a Sales Commission Plan.

32. No such plan was ever given, delivered, sent, or made accessible to, Mr. Ramachandran. These concerns were crystalized when his counter-part, Ms. Ramona Hernandez, another Senior Vice of President of sales flatly admitted to him that no such Sales Commission plan exists, or ever existed.

33. Eventually, Mr. Ramachandran realized he was not receiving the Sales Commissions he was duly owed. This was brought to the attention of Mr. Bracken in a December 2017 meeting, including Ms. Michelle Garrison, the Chief Financial Officer of GetixHealth. This was the beginning of the end.

34. Mr. Ramachandran brought to their attention that he was owed a percentage of the revenue brought in by a successfully signed deal with WoundCentrics - a company out of Lubbock, Texas.  Mr. Bracken responded that he could only offer Mr. Ramachandran *half* of his duly owed commission percentage.

35. WoundCentrics even showed up on Mr. Ramachandran's commission spreadsheet sent by Michelle Garrison (CFO). However, the company was subsequently removed the next month for no reason. Further, Mr. Ramachandran was intentionally left out of financial modeling of WoundCentrics deal – meaning there was no way for him to know what commission was owed to him.

36. This split was the product of Bracken and Garrison approaching both Gary Rogers and Ramachandran, and asking them to conclude the same deal.  GetixHealth did not want to pay either employee their complete commission for the successful conclusion of the contract, so the company proposed the above split.

37.     This behavior was not an isolated incident.  Sometime later, Mr. Ramachandran and one

        of his direct report independent contractors, Tamra Swindoll, both brought on the group

        Austin Surgeons; and Sales Commissions were successfully paid to *both* Ramachandran

        and Swindoll at that time.

38.     On information and belief, Ms. Ramona Hernandez, who similarly served as a fellow

        Senior Vice President and head of sales, left GetixHealth in January of 2017, allegedly due

        to her own concerns about Getix failing to pay her owed commissions.

**UNPAID EXECUTIVE BONUS**

39.     The Employee Bonus for the prior year pays out at a consistent, arbitrary date in March.

        Hence when Mr. Ramachandan was still employed in March 2017, he received his bonus

        for 2016.  However, despite the fact that Mr. Ramachandan was still employed in March

        of 2018, and not terminated until April, 2nd, 2018, Mr. Ramachandan was *not* given the

        bonus for 2017.

40.     Emma Donald, the head of HR, informed Mr. Ramachandran that no performance

        evaluations were ever conducted regarding him prior to his termination.  Mr. Bracken had

        never conducted a performance review upon Mr. Ramachandran.  Hence Ramachandran's

        termination was in direct response to his complaints regarding - not only his commissions

        and bonus - but also his discriminatory treatment as a minority.

41.     After Mr. Ramachandran complained of Bracken's failure to pay his annual bonus, Mr.

        Bracken emailed him vaguely outlining an arbitrary rating system which was required to

        receive said bonus.  This rating system was never referenced in Mr. Ramachandran's

        employment agreement, and its inclusion in an email concurrent with his termination was

        the first that Mr. Ramachandran had ever heard of it.

42.     After Mr. Ramachandran complained to Mr. Bracken about the failure to pay his
Commissions on or about December 14th, 2017, in a conference call with Michelle
Garrison, the CFO, things took a turn.  After this point in time, Mr. Bracken himself began
taking action to pave a path towards Mr. Ramachandran's termination and the subsequent
refusal to pay Sales Commissions duly owed to Mr. Ramachandran.

43.     In direct response to being challenged on the issue of unpaid Commission, Mr. Bracken
then began taking steps to ensure Mr. Ramachandran would be unable to continue to
perform in any meaningful fashion at GetixHealth.  This would include the absolute
blocking of Mr. Ramachandran from essential meetings and information regarding current,
ongoing contracts and business between GetixHealth and third party clients.

44.     Mr. Ramachandran's primary duty was to "manage a team of individuals who will
promote, sell, implement, and manage physician practice management services including
billing and clinical data management for provider groups", and that's exactly what he did
during his tenure at GetixHealth. Eric Ostrosky had weekly calls with Kevin Lonergan
(President) and Mr. Ramachandran didn't, even though they both ostensibly reported to
Mr. Lonergan.

45.     Mr. Bracken's negative treatment of minorities (in particular anyone who is not African
American or Caucasian), and of Mr. Ramachandran in particular, only escalated thereafter,
and reached its peak in January of 2018.  At the start of 2018, Mr. Bracken brought Mr.
Ramachandran to Mandeville, Jamaica for the sole purpose of opening a GetixHealth
office on the campus of the University of Northern Caribbean, Jamaica – a known Seventh
Day Adventist university.

46.     At this university, Mr. Bracken intentionally isolated and intimidated Mr. Ramachandran. This was a three (3) day trip, and Mr. Bracken made Mr. Ramachandran sequester until the last 3 hours of the third day, wherein Mr. Ramachandran realized he was the only non-black, non-Seventh Day Adventist in the entire facility.

47.     Upon returning from this trip, Mr. Ramachandran was again excluded from bi-weekly calls; but this time the isolation was perpetrated by Mr. Bracken himself.

Mr. Ramachandran was, again, intentionally cut off from information, and the ability to access that information, by his own immediate supervisor.  This prohibition from executive level meetings and information continued until Mr. Ramachandran's termination from employment in early April, 2018.

48.     To be clear, Charles Bracken limited necessary financial information (e.g., monthly revenue numbers) which affected Mr. Ramachandran's ability to refute discrepancies in his own pay and commissions. He was treated severely after refuting Mr. Bracken's offer to pay me "half of my commissions" during a meeting on December 14, 2017 which included Mr. Bracken and Ms. Michelle Garrision, CFO of GetixHealth.

49.     In essence, Charles Bracken used Kevin Lonergan, and Jeffrey Schulman, as his instruments to mistreat and discriminate against Mr. Ramachandran, defraud him of his duly owed bonus and/or commissions, and ultimately terminate him using performance - which Bracken himself hindered and hobbled - as a pretext for termination.

Mr. Ramachandran has remained unemployed since the date of his termination despite his best efforts to secure other employment.

# VI.   DISCRIMINATION

**A.   42 U.S.C. 2000e, et seq, Title VII of the Civil Rights Act of 1964 <u>RACIAL DISCRIMINATION PERPETRATED BY DEFENDANTS GETIXHEALTH & TRIVEST, and CHARLES BRACKEN & KEVIN LONERGAN,</u>** *individually*

50.   Plaintiff hereby adopts all factual allegations above *in haec verba*.

51.   A claim of intentional discrimination may be proved by either direct or circumstantial evidence. See *Wallace v. Methodist Hosp. Sys*. 271 F.3d 212, 219 (5th Cir. 2001).  In cases of circumstantial evidence, courts usually follow the burden shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), for indirect discrimination claims. See *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005).

52.   To establish a *prima facie* case of discrimination, a plaintiff must establish he: (1) is a member of a protected class; (2) was qualified for the position at issue; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class, or other similarly situated persons were treated more favorably.  *McCoy*, 492 F.3d at 556; *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001).

53.   In the instant case, Plaintiff is prepared to show that he (1) is a member of a class ( East Asian / Indian ) who is intended to be protected by the statute; (2) was qualified for the position at issue, an irrefutable fact as he was vetted and hired by the Defendant; (3) was subject to adverse employment action, in the form of near-constant harassment by his managers at every level, the creation of a hostile work environment, the denial of his rightly earned commissions, and his ultimate termination as was orchestrated by his immediate supervisors (Bracken, Schulman, & Lonergan) and his employer (GetixHealth);

and all other similarly situated persons (all other Caucasian [Senior] Vice President

employees) were treated more favorably. *Id*.

**B.      §21.000 *et seq* of the TEXAS LABOR CODE, ( "TCHRA" )
RACIAL DISCRIMINATION PERPETRATED BY DEFENDANTS
GETIXHEALTH & TRIVEST, and CHARLES BRACKEN & KEVIN
LONERGAN, *individually*, *in the alternative***

54.     Plaintiff hereby adopts all factual allegations above *in haec verba*.

55.     Plaintiff brings suit against Defendant for damages sustained as a result of their

discrimination in wilful violation of the Texas Commission on Human Rights Act **§**21.000

*et seq* of the Texas Labor Code (the "Act"), in the alternative.

56.     Under §21.051 of the Texas Commission on Human Rights Act (codified within §21.000

*et seq* of the Texas Labor Code): An employer commits an unlawful employment practice

if because of ...*race*, *or gender* the employer: (1)... discharges an individual, or

discriminates in any other manner against an individual in connection with compensation

or the terms, conditions, or privileges of employment;  or (2)  limits, segregates, or

classifies an employee ... in a manner that would deprive or tend to deprive an individual

of any employment opportunity or adversely affect in any other manner the status of an

employee. *Id*.

57.     Pursuant *Ysleta ISDA v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005). "To prevail on a

claim of racial discrimination, the plaintiffs had to prove that (1) they were members of a

class protected by the act, (2) they were qualified for their positions, (3) they were

terminated, and (4) they were treated less favorably than similarly situated members of the

opposing class. *Id*.

58.    In this case, Plaintiff (1) is East Asian / Indian, hence he belongs to a protected class, (2) was qualified for his position, (3) was terminated from his position, and (4) the plaintiff was treated less favorably than similarly situated Caucasian employees. *Id.*

59.    Moreover, Plaintiff would show that the hostile work environment and negative treatment was severe, pervasive, and that it destroyed her opportunity to succeed in the workplace, despite his multitude of formal and informal complaints to Bracken and HR.

> Under §21.125 of the Texas Commission on Human Rights Act (codified within §21.000 *et seq* of the Texas Labor Code): Except as otherwise provided by this chapter, an unlawful employment practice is established when the complainant demonstrates that race, color, sex, national origin, religion, age, or disability was a mere *motivating factor* for an employment practice, even if other factors also motivated the practice, unless race, color, sex, national origin, religion, age, or disability is combined with objective job-related factors to attain diversity in the employer's work force. *(Emphasis added) Id*.

60.    Plaintiff argues that his race were the reason that he was subjected to adverse employment actions, including his ultimate termination, and would also contend that race was the motivating factor - in part or in whole - regarding such adverse employment actions, as well as his eventual termination.  This allegation is made in light of multiple employees of GetixHealth, who are neither Caucasian nor African American, who have lodged similar complaints in the past, as is known to the Plaintiff on personal knowledge and recall.

61.    Plaintiff is prepared to show that any objective job-related factor exists which would foster the requirement of his termination due to "poor performance" is mere pretext, as he was never given an annual performance review - despite his Caucasian counterparts receiving theirs - and would argue that no legitimate non-discriminatory reasons exists that would challenge his assertions, or which could rebut or refute his claims at summary judgment.

62.   Plaintiff alleges and will prove that Defendants illegally discriminated against him based upon his race under the Texas Commission on Human Rights Act: §21.000 *et seq* of the Texas Labor Code.

### C.   42 U.S.C. §1981 RACIAL DISCRIMINATION PERPETRATED BY KEVIN LONERGAN and CHARLES BRACKEN, *Individually*

63.   Plaintiff hereby adopts all factual allegations above *in haec verba*.

64.   **§1981 STATUTE OF LIMITATIONS**.  Pursuant to 28 U.S. Code §1658(a); Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.

65.   Section 1981 prohibits individuals, including other employees, from racial discrimination against an employee. See *Cardenas v. Massey*, 269 F.3d 251, 268 (3d Cir. 2001) ("Although claims against individual supervisors are not permitted under Title VII, this court has found individual liability under § 1981 when [the defendants] *intentionally* cause an infringement of rights protected by Section 1981, regardless of whether the [employer] may also be held liable."); *Al-Khazraji v. Saint Francis College*, 784 F.2d 505, 518 (3d Cir. 1986) ("employees of a corporation may become personally liable when they intentionally cause an infringement of rights protected by Section 1981, regardless of whether the corporation may also be held liable")**.**

66.    Section 1981 prohibits race discrimination & retaliation [1], which includes East Asians / Indian within that ambit.  For purposes of Section 1981, Indian is a "race".  *See Jatoi v. Hurst-Euless Bedford Hosp. Authority*, 807 F.2d 1214, 1218 (5th Cir. 1987); *Banker v. Time Chem., Inc.*, 579 F. Supp. 1183, 1186 (N.D. Ill. 1983).

67.    In the absence of direct evidence of discrimination, Section 1981 cases are governed by the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999) (noting that Section 1981 claims and Title VII claims use the same burdens of proof and analysis).

68.    First, the plaintiff must establish a *prima facie* case of discrimination, "which requires a showing that the plaintiff (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside her protected group or was treated less favorably than other similarly situated employees outside the protected group." *McCoy*, 492 F.3d at 556; *Caldwell v. Univ. of Houston Sys.*, 520 Fed. Appx. 289, 293 (5th Cir. 2013); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 425 (5th Cir. 2000).

69.    The Plaintiff has established a prima facie case, and hereby sets forth the argument that any such proffered reasons for termination issued forth by the Defendant, especially those leveled against the Plaintiff at any point in time after the vast multitude of his complaints to Getix Human Resources personnel, create the assumption that such reasons are mere pretext – or while partially true, are not the only motivating factors of the adverse

---

[1] On May 27th, 2008, The Supreme Court delivered its decision in *CBOCS West, Inc.* v. *Humphries* holding that Section 1981 of the Civil Rights Act of 1866 unequivocally includes claims of **retaliation** by those pursuing race and color claims under the statute.

employment actions taken against the Plaintiff.  With this prima facie case, Plaintiff seeks

to address the adverse employment actionsleveled against him by both Lonergan and

Bracken throughout the tenure of his employment with the Defendant GetixHealth.

## VII.   RETALIATION

**A.   42 U.S.C. 2000e, et seq, Title VII of the Civil Rights Act of 1964 RACIAL RETALIATION PERPETRATED BY DEFENDANTS GETIXHEALTH & TRIVEST PARTNERS**

70.   A plaintiff may proceed with a Title VII Retaliation claim even after the underlying

discrimination claim has been dismissed. *E.g. Steffy v. Ford Motor Co. Inc.*, 04-cv-319s,

2007 U.S. Dist. Lexis 20524, at \*35 (W.D.N.Y. March 22, 2007)(discrimination and

harassment claim dismissed but plaintiff allowed to proceed with retaliation claim); *Rivas*

*v. Steward Ventures Inc. d/b/a Alamo Rental Car*, No. CV-05-3801, 2007 U.S. Dist.

Lexis 10232, at \*17 (D. Ariz., Feb. 13, 2007)(granting summary judgment on plaintiff's

sexual harassment claim but permitting retaliation claim to proceed).

71.   Absent direct evidence of discrimination, the analytical framework outlined in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community*

*Affairs v. Burdine*, 450 U.S. 248 (1981) is used to decide Title VII Retaliation cases based

on circumstantial evidence.[2]  This analytical model has generally been adopted for

retaliation claims regardless of the court or the statutory basis for the protected activity.

72.   A plaintiff pursuing a Title VII Retaliation claim must initially establish a *prima facie* case.

To do so, the plaintiff must show: (i) he or she engaged in protected activity; (ii) the

employer carried out an adverse employment action; and (iii) a casual connection between

---

[2]Title VII, which prohibits employers from discriminating against employees and applicants based on an individuals' race, color, religion, sex or national origin, *also* prohibits an employer from retaliating against an employee who has engaged in activity protected by the Act. 42 U.S.C 2000e-3(a).

the protected activity and the adverse action. *Stewart*, 586 F.3d 321, 331 (5th Cir. 2009).

73.      In the Fifth Circuit, the mixed motive or "motivating factor" standard is also available in

circumstantial evidence retaliation cases.  Accordingly a plaintiff can recover if she can

show that protected activity was a "motivating factor" in the employment decision, even if

other factors also motivated the practice.  See, *e.g. Richardson v. Monitronics Intern.,*

*Inc.*, 434 F.3d 327, 333 (5th Cir. 2005); see *Smith v. Xerox Corp.*, 602 F.3d 320, 333 (5th

Cir. 2010) (holding mixed-motive standard applies to Title VII retaliation claims even

where plaintiff has no direct evidence of retaliation).

74.    An employee may show that she has engaged in protected activity by demonstrating either

that she participated in an activity protected by the employment statute, or that she

opposed an unlawful employment practice prohibited by the employment statute. See

*Crawford v. Metro Gov't Nashville & Davidson County*, 555 U.S. at 277-78 (2009).

75.    An employer may not retaliate against an employee for engaging in a protected activity.

Pursuant to 42 U.S.C. 2000e-3(a) protected activities include, but are not limited to, (i)

the filing of a lawsuit, (ii) a request for maternity leave, (iii) hiring an attorney, or (iv) an

*informal oral complaint*. *Id*.(emphasis added).

76.    Plaintiff would show that he has met the required elements under *Stewart*. (i) Plaintiff

engaged in protected activity in the form of such oral and written complaints to his

GetixHealth managers, the President, the CEO, and the GetixHealth Human Resource

representative; (ii) his employer(s) carried out multiple adverse employment action(s)

against him, including her harassment and termination; and (iii) a causal connection

between the protected activity and the adverse action exists in fact and in temporal

proximity.  *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 331 (5th Cir. 2009).

77. Plaintiff would further argue that the causal nexus is bolstered by the extreme proximity in time between written and oral complaints, his complaint of not receiving full commissions owed to him, the subsequent cessation of access to executive meetings and information, and his subsequent erroneous termination.

78. Plaintiff is aware that pursuant to the holding in *Nassar*, Title VII Retaliation cases still require a "but-for" causation to substantiate the claim of retaliation. *University of Texas Southwestern Medical Center v. Nassar*, 2013 U.S. LEXIS 4704 (June 24, 2013).  With this in mind, Plaintiff contends that 'but-for' his multitude of complaints, constituting protected activity, to the Human Resources Director regarding the  behavior of the Defendant's Managers, President, and CEO as well as the denial of his outstanding commissions, he would not have been terminated.

### B.   TCHRA RACIAL RETALIATION PERPETRATED BY DEFENDANTS GETIXHEALTH & TRIVEST PARTNERS, *in the alternative*

79. Plaintiff hereby adopts all factual allegations above *in haec verba.*

80. **Pursuant to Section 21.055.  RETALIATION.**  An employer, labor union, or employment agency commits an unlawful employment practice if the employer, labor union, or employment agency retaliates or discriminates against a person who, under this chapter: (1)  opposes a discriminatory practice; (2)  makes or files a charge; (3)  files a complaint;  or (4)  testifies, assists, or participates in any manner in an investigation, proceeding, or hearing.

81. Like federal employment statutes,  the  TCHRA prohibits an employer from retaliating against a person who 1) opposes a discriminatory practice; 2) makes or files  a  charge;  3) files  a  complaint;  or  4)  testifies, assists, or    participates   in   any   manner   in   an

investigation, proceeding or hearing.  Tex. Lab. Code §21.055.  Because the purpose of the TCHRA is to provide for the execution of the policies of Title VII of the Civil Rights Act of 1964, "analogous federal statutes and the cases interpreting them" are guiding authority.  Tex. Lab. Code §21.001(1) (Vernon 1996); *Quantum Chem. Corp* v. *Toennies*, 47 S.W.3d 473, 476 (Tex. 2001).

82.   Texas courts have articulated the same elements as federal courts for establishing a prima facie case of retaliation under the TCHRA.  See *Wal-Mart Stores*, *Inc.* v. *Lane*, 31 S.W.3d 282, 295 (Tex.App. – Corpus Christi 2000), rehrg. overruled).  As with federal statutes, a plaintiff under the TCHRA must prove that he or she engaged in some conducted protected by the Act.

83.   For the above reasons, Plaintiff hereby re-incorporates all above arguments issued for her federal claims, and would apply same to her state claims as alleged herein, in the alternative.

**C.     42 U.S.C. §1981      RACIAL RETALIATION [3] PERPETRATED BY GETIXHEALTH, TRIVEST PARTNERS, AND KEVIN LONERGAN & CHARLES BRACKEN, *Individually***

84.   Plaintiff hereby adopts all factual allegations above *in haec verba*.

85.   Specifically, Plaintiff would reference the temporal proximity of the sequential submission of his multiple complaints of race discriminatory behavior and hostile work environment to his managers and supervisors, the president, and the CEO of GetixHealth, the ***multiple*** attempted meetings / teleconferences with both the CEO and GetixHealth Human

---

[3]  As of May 27th, 2008, the United States Supreme Court delivered its decision in *CBOS West, Inc.* v. *Humphries*, NO 06-1431 (May 27, 2008)(slip op.)., holding that Section 1981 of the Civil Rights Act of 1866 unequivocally includes claims for retaliation by those pursuing race and color claims under the Statute.

Resources Representatives, and finally, Mr. Ramachandran's complaint regarding his unpaid commissions, which resulted in his isolation from executive meetings, which directly led to his termination due to a purported "poor performance" mere weeks later.[4] This "poor performance" and the Plaintiff's termination were facilitated by GetixHealth and Trivest Partners acting in concert and under the direction of Kevin Lonergan and Charles Bracken, individually.

86. Plaintiff restates the findings in *Cardenas* 269 F.3d 251 above, and reiterates his prior contention that 1981 claims and Title VII claims are examined under the same lenses pursuant to *Shackleford*, and as such, would assert that a cause for retaliation under 1981 falls under the same burdens as a cause for retaliation under Title VII. Hence, no alteration should be required in its prosecution. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999) (noting that Section 1981 claims and Title VII claims use the same burdens of proof and analysis.)

87. Plaintiff would seek to bring this charge of Retaliation against the GetixHealth President, and the GetixHealth CEO, individually, as they acted directly in bringing about the intentional infringement of her rights which were protected under 42 U.S.C. 1981.[5]

88. To successfully bring a claim of retaliation, the complainant must generally establish that 1) he or she **engaged** in activity protected by the statute; 2) that the employer took an **adverse employment action** against him or her; and 3) a **causal connection**

---

[4] The amount of **time** between an employee's protected activity and the adverse employment action is "part of the analysis" with respect to whether an employee can establish the necessary causal connection. *Gee*, 289 F.3d 346 n.3 (quoting *Shirley* v. *Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir. 1992)). Timing can be a relevant factor in determining whether a causal connection exists where the timing is "suspiciously proximate." *Fabela*, 329 F.3d 417 n.9.

[5] See *Cardenas v. Massey*, 269 F.3d 251, 268 (3d Cir. 2001); *Al-Khazraji v. Saint Francis College*, 784 F.2d 505, 518 (3d Cir. 1986)

exists between the protected activity and the adverse employment action. (Emphasis added) *Gee* v. *Principi*, 289 F.3d 342, 345 (5th Cir. 2002)(Title VII); *Davis* v. *Dallas Area Rapid Transit*, 383 F.3d 309 (5thCir. 2004)(retaliation under 42 U.S.C. §1981); *Hernandez* v. *Crawford Building Material Co.*, 321 F.3d 528 (5th Cir. 2003)(ADEA); 42 U.S.C. §12203(a), (b) (Americans with Disabilities Act).

89.     **ENGAGEMENT**.  The Fifth Circuit defines protected activity as "opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting or participating in any investigation, proceeding or hearing under Title VII." *Ackel* v. *Nat'l Communs., Inc.*, 339 F.2d 376, 385 (5thCir. 2003). More simply, "Title VII prohibits an employer from retaliating against an employee because that employee has complained about acts of discrimination at work." *Manning* v. *Chevron Chem. Co.,LLC*, 332 F.3d 874 (5th Cir. 2003).

90.     To that end, the Plaintiff did make *multiple* complaints to GetixHealth Human Resources prior to his termination from employment, and did engage in the internal administrative complaint processes of the Defendant.[6]  However, the Defendant's own CEO then neutralized these attempts by personally cancelling such attempts at communication and complaint.

91.     Moreover, a plaintiff is not required to establish an actual violation of Title VII (or 1981) to invoke the protections of the anti-retaliation provisions. Rather, a plaintiff only needs show that a charge was made, a complaint was submitted, or that participation in investigation of a claim occurred. *Green* v. *Administrators of*

---

[6] An employee's use of an employer's internal administrative process to file an employment discrimination complaint is "clearly protected activity" for purposes of a retaliation claim.  *Fierros* v. *Tex. Dep't of Health*, 274 F.3d 187, 194 (5th Cir. 2001).

*Tulane Educational Fund*, 284 F.3d 642, 657 (5th Cir. 2002). (A plaintiff's reasonable belief that she was in the process of being terminated because of her gender and made a complaint is sufficient for a retaliation claim.) *Id.*

92. Plaintiff would site his multitude of complaints, both submitted in writing/email, and verbal interactions with several GetixHealth officers, and it's Human Resources department, to display his qualification in engaging within the employer's internal administrative process, actively and continuously up to the date of his termination.

93. **ADVERSE ACTION**. Although the Fifth Circuit generally applies Title VII holdings to claims brought under §1981, the definition of "adverse employment decision" is broader under §1981. Under §1981, reprimands, disciplinary filings and transfers that are "equivalent to demotions" may be considered adverse employment actions. *Banks*, 320 F.3d at 580; *Erves*, 2004 WL 904122. Plaintiff contends that his termination qualifies as an "adverse action".

94. **CAUSAL CONNECTION**. The final element of a plaintiff's prima facie case requires a plaintiff to establish a causal connection between her protected activity and the adverse employment action suffered. This causal link "need not rise to the level of a 'but for' standard.'" *Gee*, 289 F.3d at 345 (quoting *Raggs* v. *Miss. Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002)). Nor does a plaintiff need to prove that "her protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link' element of a *prima facie* case." *Id.* (quoting Long v. *Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996)). In fact, the causal link element is "much less stringent" than the "but for" causation standard to be presented to a jury for determination. *Banks-Jones* v. *Hilton Reservations*

*Worldwide, LLC*, 2004 WL 190266 (N.D. Tex. 2004)(quoting *Montemayor* v. *City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001)).

95.  Finally, in the more usual case of circumstantial evidence, the burden of production, not proof, shifts to the employer upon plaintiff's establishment of his or her prima facie case. See gen. *Davis*, 383 F.3d at 320. However, Fifth Circuit case analysis overwhelmingly deals with whether the plaintiff has demonstrated that the employer's articulated reason is a pretext for retaliatory motive. See *Aldrup* v. *Caldera*, 274 F.3d 282, 286 (5thCir. 1996).

96.  To this end, the Plaintiff would resolve that his termination was in fact in almost immediate retaliation by his supervisors for complaining of discriminatory and harassing behavior by his GetixHealth supervisors – by the GetixHealth CEO for attempting to deny the Plaintiff the commissions he was entitled to – and that such termination was executed due to pretextual reasons.

## VIII.   HOSTILE WORK ENVIRONMENT

97.  Plaintiff hereby adopts all factual allegations above *in haec verba*.

98.  A claim that a Plaintiff has been subjected to a Hostile Work Environment "entails ongoing harassment, based on the Plaintiff's protected characteristics, so sufficiently severe or pervasive that it has altered the conditions of employment an created an abusive working environment." *Bartosh* v. *Sam Houston State Univ.,* 259 S.W.3d 317, 324 (Tex. App. – Texarkana 2008, pet. denied) (citing *Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 Ct. 2399, 2405 (1986)).

99.  Ramachandran hereby contends that at all times relevant, all the abuses and constant harassment which he received from each of his individual supervisors (Bracken, Schulman,

and Lonergan), was based on his protected racial / ethnic characteristic ( East Asian / Indian ).  The factual allegations clearly show that this egregious treatment was on-going and pervasive throughout the tenure of his employment with GetixHealth, and was severe enough that his  myriad of complaints to Emma Donald in Getix Human Resources required his rotation to different supervisors (Mr. Lonergan, Mr. Schulman, and Mr. Bracken) in order to alleviate tension between the Plaintiff and his individual managers. These conditions caused his productivity to suffer, and fundamentally altered the conditions of his employment.

100.     Defendants GetixHealth & Charles Bracken cannot refute this claim - else it would not have required  Defendant Bracken to remove Ramachandran's managers three (3) times, or caused Mr. Bracken to cancel *multiple* teleconferences scheduled to air Mr. Ramachandran's myriad grievances with it's Human Resources Director, Ms. Emma Donald.

## IX.     INFERENCE OF PRETEXT

101.     Where, as here, the plaintiff makes out a *prima facie* case of discrimination, the defendant must articulate a legitimate non-discriminatory reason for the adverse employment decision.  *See Baker,* 430 F.3d at 754-55.  After the employer does so, "any presumption of [discrimination] drops from the case" and the burden shifts back to the employee to establish that the employer's "stated reason is actually a pretext for [discrimination]." *Baker*, 430 F.3d at 755 (quoting *Septimus*, 399 F.3d at 610-11).

102.     Plaintiff would show that terminating him for allegedly " poor performance " or any aberration in performance  – in light of the vast multitude of complaints filed by the Plaintiff himself, with the Defendant's Human Resources representative against not one,

but three (3) different supervisors – establishes the so-called 'legitimate non-discriminatory reason' for termination as mere pretext. By and through this argument, Plaintiff's claims shall survive summary judgment, as the Defendant cannot set forth a legitimate non-discriminatory reason for its actions which is worthy of credence.[7]

## X.  FRAUD
### A.  FRAUD IN THE INDUCEMENT & FRAUD IN THE FACTUM, BY GETIXHEALTH, TRIVEST PARTNERS, AND CHARLES BRACKEN *individually*

103.  Plaintiff hereby adopts all above factual allegations herein *in haec verba*.

104.  Plaintiff would show that he is within the statute of limitations to bring this cause of action, pursuant to Tex. Civ. Prac. & Rem. Code 16.004(a)(4), and that the statute did not begin to toll until Plaintiff was (recently) made aware of the facts at hand.[8]

105.  Plaintiff would further show that the employment agreement executed for GetixHealth clearly displays his Commission pay out percentages and terms. It also references a non-existent Commission Payment Plan. Defendants were aware of the non-existence of such a Commission Payment Plan, yet touted it as a benefit of employment in the Plaintiff's employment agreement.

106.  Pursuant to §162(1)(a) of the Restatement (Second) of Contracts, "A Misrepresentation is *Fraudulent* if the maker intends his assertion to induce a party to manifest his assent and the maker (a) knows or believes that the assertion is not in accord with the facts... A Misrepresentation is *Material* if it would be likely to induce a reasonable person to

---

[7] *See, e.g., Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll.*, 719 F.3d 356, 365 n. 10 (5th Cir. 2013) (reversing summary judgment for the employer in a discrimination case, and holding that, "[e]vidence demonstrating that the employer's explanation is false or unworthy of credence . . . is likely to support an inference of discrimination *even without further evidence of defendant's true motive*.") (italics in original)

[8] *Hooks* v. *Samson Lonestar, L.P.*, 2015 Tex. LEXIS 56, P*8 (Tex. 2014).

manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so."

107.    Texas elements determining Fraud include the following: (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.  *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001). See also *Italian Cowboy Partners, Ltd.* v. *Prudential Ins. Co. Of Am.*, 341 S.W.3d 323, 337 (Tex. 2011); *Aquaplex, Inc.* v. *Rancho la Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009).

108.    Plaintiff would show that the Defendants in this matter, by means of a scheme designed to defraud employees and contractors of their duly owed commissions, made misrepresentations and omissions of fact to the Plaintiff concerning certain aspects and benefits of his employment and performance.  This was done willfully and maliciously. Specifically, GetixHealth and Charles Bracken misrepresented the payment plan for the Plaintiff's commissions, which he earned by and through the course of his performance during the tenure of employment with the Defendant.

109.    Plaintiff will show that, by and through his actions at all times, Mr. Bracken, through operation of his employees and managers (such as Mr. Lonergan and Mr. Schulman) fully intended to defraud Mr. Ramachandran of his earned commissions on the projects and clients he was able to deliver to GetixHealth. As there is no actual Commission Payment Plan, it is entirely reasonable to assume that unpaid commissions are returned to the

GetixHealth coffers.

110.   Plaintiff establishes a *prima facie* instance of Fraud; (1) Defendants made material representations to Plaintiff; (2) the representations were patently false; (3) when the representations were made, the Defendants knew it was false, or made them recklessly without any knowledge of the truth and as a positive assertion; (4) the Defendants made the representations with the intent that the Plaintiff should act upon it[9]; (5) the Plaintiff acted in reliance on those same representations; and finally (6) the Plaintiff thereby suffered grievous  financial injury.  *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749.

111.   While breach of a contract *alone* is not evidence that a party did not intend to perform, "breach combined with 'slight circumstantial evidence' of fraud" is some evidence of fraudulent intent, enough to support a verdict.  *Tony Gullo Motors I, L.P.* v. *Chapa*, 212 S.W.3d 299,305 (Tex. 2006) (citing *Spoljaric* v. *Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986)).   "[A] party's intent is determined at the time the party made the representation, [but] it may be inferred from the party's subsequent acts after the representation is made." *Spoljaric*, 708 S.W.2d at 434 (citing *Chicago, T. & M.C. Ry. Co.* v. *Titterington*, 19 S.W. 472, 474 (1892)).   Stated more precisely, "[t]he speaker's intent at the time of the representation may be inferred from the speaker's subsequent acts after the representation was made." *Id*.

## B.    FRAUD BY NON-DISCLOSURE

112.   Plaintiff hereby adopts all above factual allegations herein *in haec verba*.

113.   Plaintiff would show that he is within the statute of limitations to bring this particular

---

[9]Plaintiff has satisfied the heightened element of *reliance* required of Fraud in the Inducement, as Plaintiff did in fact enter into a binding agreement based on the Defendant's false representations.  See *Haase*, 62 S.W.3d 798-99; *Foley* v. *Parlier*, 68 S.W.3d 870, 885 n.2 (Tex.App. – Forth Worth 2002, no pet.). [ Hence Plaintiff is entitled to Benefit of the Bargain damages. ]

cause of action, pursuant to Tex. Civ. Prac. & Rem. Code 16.004(a)(4), and that the statute did not begin to toll until Plaintiff was (recently) made aware of the facts at hand.[10]

114.    Plaintiff shows a *prima facie* instance of fraud by non-disclosure as follows:

(i) Defendants concealed from, or failed to disclose, certain facts to the Plaintiff;

(ii) Defendants had a legal duty to disclose such facts to the Plaintiff;  (iii) the facts were material in nature; (iv) Defendants knew that the Plaintiff was ignorant of such facts, and did not have an equal opportunity to discover the facts;  (v) Defendants were deliberately silent when they actually had a duty to speak; (vi) By Defendant's failure to disclose the facts intending to induce Plaintiff to either take some action or refrain from acting; and (vii) the Plaintiff actually relied on the non-disclosure and as a result, was injured as a result of acting without knowledge of the undisclosed facts. The Defendants held fiduciary duty to disclose information as an operation of law. *Bradford* v. *Vento*, 48 S.W.3d 749, 755 (Tex. 2001).

115.    Defendants concealed material information from the Plaintiff, and failed to disclose material facts known to these Defendants. Specifically, Defendants knew or should have known that employees would execute employment agreements, and any and all associated restrictive covenants, based upon the offer of benefits / wages / bonuses / commissions, made the inducement for the execution of an employment agreement.

116.    Defendants had a duty to retain a commission payment schedule in place, and follow such a schedule in the event that employees eligible may receive such commissions as they are rightly achieved and earned.  By failing to have such a plan, or knowingly failing to have such a plan, Defendants have deliberately created a mechanism whereby they may deny the

---

[10] *Hooks* v. *Samson Lonestar, L.P.*, 2015 Tex. LEXIS 56, P*8 (Tex. 2014).

Plaintiff his duly earned commission and directly profit from such detrimental reliance by the Plaintiff.

## C.   NEGLIGENT MISREPRESENTATION

117.   Plaintiff hereby adopts all above factual allegations herein *in haec verba*.

118.   Plaintiff would present a prima facie case of Negligent Misrepresentation by the following elements; (1) the Defendants made misrepresentations to the Plaintiff in the course of the Defendants' business or in a transaction in which the Defendants had an interest; (2) the Defendants supplied false information for the guidance of others; (3) the Defendants did not exercise reasonable care or competence in obtaining or communicating the information; (4) the Plaintiff justifiably relied on the representation; and (5) the Defendants' negligent misrepresentation proximately caused the Plaintiff's financial injury. *McCamish, Martin, Brown, & Loeffler* v. *F.E. Appling Interests*, 991 S.W.2d 787, 791 (Tex.1991); see also *Larson* v. *Langford*, 41 S.W.3d 245, 249-50 (Tex.App.– Waco 2001, pet. denied).

## XI.   EXEMPLARY DAMAGES – NO STATUTORY CAP

119.   Plaintiff Ramachandran hereby adopts all above factual allegations herein *in haec verba*.

120.   A Plaintiff who successfully prosecutes a suit for fraud can recover actual and exemplary damages under Section 41.003(a)(1) of the Texas Civil Practice and Remedies Code, as well as § 27.01(b)&(c) of the Texas Business and Commerce Code.  Plaintiff seeks exemplary damages as provided for by this same section, because the Defendants perpetrated a fraud upon him and acted with malice with respect to the Plaintiff.  The Defendants, with the intent to harm and defraud the Plaintiff, engaged in outrageous conduct, absorbing the Plaintiff's unpaid commissions into the company's coffers.

## XII.    CONDITIONS PRECEDENT

121.    All conditions precedent to Plaintiff's recovery have occurred or have been performed as required by law.

## XIII.    DAMAGES

122.    The damages under Section 1981 and Title VII consist of back-pay, front-pay (or reinstatement), compensatory damages, punitive damages, attorney's fees, and costs. Each component is explained below:

123.    **BACK PAY**.  Prevailing claimants under the anti-discrimination laws may recover lost back-pay and benefits.  *See Miller v. Raytheon Co.*, 716 F.3d 138, 146 (5th Cir. 2013). The purpose of back pay is to "make whole the injured party by placing that individual in the position he or she would have been in but for the discrimination." *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1136 (5th Cir. 1988).

124.    **FRONT PAY**.  "Front pay refers to future lost earnings." *Wal-Mart Stores v. Davis*, 979 S.W.2d 30, 45 (Tex. App.–Austin 1998, pet. denied).  Regarding the calculation of front-pay, the Fifth Circuit has stated that  "[f]ront pay is . . . calculated from the date of judgment to age 70, or the normal retirement age, and should reflect earnings in mitigation of damages." *Patterson*, 90 F.3d at 936 n. 8 (citing J. Hardin Marion, Legal and Equitable Remedies Under the Age Discrimination in Employment Act, 45 MD.L.REV. 298, 330–334 (1986)).  *See also Blum v. Witco Chem. Corp.*, 829 F.2d 367, 374 (3d Cir. 1987) ("In calculating a front pay award, the jury must consider the expected future damages caused by defendant's wrongful conduct from the date of judgment to retirement.").

125.    **COMPENSATORY DAMAGES**.  Ms. McClain has suffered future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and

other nonpecuniary losses, for which she seeks recovery in this lawsuit under Section 1981 and Title VII.  *See, e.g.*, *Salinas v. O'Neill*, 286 F.3d 827, 833 (5th Cir. 2002) (affirming $150,000.00 compensatory damages award under Section 1981 where the plaintiff did not receive a position because of his race); 42 U.S.C. § 1981A(a)(1) (providing for compensatory damages for such harms under Title VII).

126.    **PUNITIVE DAMAGES**.  The Defendants intentionally acted with malice and reckless indifference to Ms. McClain's federally protected civil rights, thus justifying awards of punitive damages under Section 1981 and Title VII.  *See, e.g.*, *Abner v. Kansas City Southern Railroad Co.*, 513 F.3d 154, 164 (5th Cir. 2008) (affirming $125,000.00 punitive damages awards to each plaintiff under Section 1981, even though each plaintiff was awarded only $1.00 in actual damages, and strongly suggesting that any punitive damages award up to $300,000.00 per plaintiff would have been appropriate even in the absence of any actual damages); *Hampton v. Dillard Dept. Stores*, 18 F. Supp. 2d 1256 (D. Kan. 1998) (awarding the plaintiff $1,100,000 in punitive damages in a Section 1981 race discrimination case); 42 U.S.C. § 1981A(a)(1) (providing for punitive damages under Title VII when the discrimination is shown to be with "malice or reckless indifference"). In *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 119 S. Ct. 2118 (1999) the U.S. Supreme Court, interpreting Title VII, held that to satisfy the "malice or reckless indifference" requirement, the plaintiff does not have to prove that the violation was egregious or outrageous.  *Id*. at 535-36.

127.    All that is required is proof that the employer knew that it was acting in the face of a perceived risk that its actions were in violations of the law's prohibition against discrimination.  *Id*.; *see also Schexnayder v. Bonfiglio*, 167 Fed. Appx. 364, 368 (5th Cir.

2006) ("a jury may award punitive damages pursuant to Title VII merely if the employer knew it *may have been* violating the law.") (italics in original). This is crystalized by Schulmberger seeing fit to fly its Regional Human Resources Director, Ms. Kenebrew, to the work sites from it's office in Shreveport, Louisiana – as well as it's requirement that Mr. Miller attend mandatory anger management and behavior classes in light of his egregious treatment of his subordinates.

128. **ATTORNEY'S FEES**.  Attorneys fees are recoverable to a prevailing plaintiff under Section 1981 and Title VII.  *See Miller*, 716 F.3d at 149 (affirming an award of attorneys' fees of $488,437.08 to the plaintiff in a single-plaintiff discrimination case that arose in Dallas); *Lewallen v. City of Beaumont,* 394 Fed. Appx. 38, 46 (5th Cir. 2010) (affirming an award of attorneys' fees of $428,421.75 to the plaintiff in a single-plaintiff discrimination failure to promote case); *Watkins v. Input/Output, Inc.*, 531 F. Supp. 2d 777, 789 (S.D. Tex. 2007) (awarding prevailing plaintiff in a single-plaintiff discrimination case tried in Houston $336,010.50 in attorneys' fees).

129. Due to the unlawful discrimination and retaliation engaged in by the Defendant, Mr. Ramachandran has experienced concrete economic harm in economic damages, as well as emotional distress.

### XIV.   JURY DEMAND

Mr. Ramachandran hereby demands a trial by jury.

### XV.   PRAYER

Mr. Ramachandran asks that she be awarded a judgment against the Defendants for the following:

a.   Actual damages including but not limited to pecuniary losses, non-pecuniary losses, Back-Pay, Front Pay, Compensatory Damages, Punitive Damages, and Exemplary Damages; in the sum of **$850,000.00**; and,

b.   Prejudgment and post-judgment interest;

c.   Attorney's fees and court costs; and,

d.   All other relief to which Plaintiff is entitled.

Respectfully Submitted,


_____*/s/Julian Frachtman*_____
H. Julian Frachtman
SDTX No. 2695031
SBN:24087536
tel: 832.499.0611
fax: 713.651.0819
Hfrachtmanlaw@gmail.com
3100 Richmond, Ste 203
Houston, Texas 77098

ATTORNEY FOR PLAINTIFF
MR. DEV RAMACHANDRAN